1
2
3
4          UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

7    ALBERT P. JAQUEZ,                    Case No.  12-cv-03359-JD

8

9                    Petitioner,          **ORDER DENYING PETITION FOR**

10          v.                            **WRIT OF HABEAS CORPUS AND**

11                                        **DENYING CERTIFICATE OF**

12   P.D. BRAZELTON,                      **APPEALABILITY**

13

14                  Respondent.           Re: Dkt. No. 28

15          This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254.

16   The Court ordered respondent to show cause why the writ should not be granted.  Respondent

17   filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits

18   with the Court.  Petitioner filed a traverse.  The petition is denied.

19                                    **BACKGROUND**

20          A jury found petitioner and his codefendant, Eric Ardoin, guilty of first degree murder.

21   *People v. Ardoin*, 196 Cal. App. 4th 102, 108 (2011); Resp. Ex. 8.  The California Court of Appeal

22   affirmed the judgment in a published opinion on June 3, 2011.  *Id.*[1]  On September 14, 2011, the

23   California Supreme Court denied a petition for review.  Resp. Exs. 9, 10.

24          The California Court of Appeal summarized the facts of the  crime as follows:

25                  The victim, Rodney Tom, was found dead by San Francisco police
                    officers in an upstairs bedroom of his home at 674 Goettingen Street
26                  in San Francisco about 8:00 on the evening of July 10, 2003.  He

27   _____

28   [1] A portion of the California Court of Appeal's ruling was unpublished and is part of the lodged
     documents.  Resp. Ex. 8.

United States District Court
Northern District of California

was lying on the floor, with his head near a corner of the room. A long wire ligature was wrapped tightly around his left wrist, and a large pool of blood was visible on the carpet under his head and neck. Additional "cast-off blood" was found near the body on the carpet, low along the wall and on the door. The pattern of the "blood spatter" indicated that the blows or other events "causing the cast off" occurred "very low near the floor or below two feet." Credit cards and other papers were strewn on the bed. Prescription pill vials were observed around the nightstands in the bedroom and in a nightstand drawer. A yellow nylon rope and newspaper were collected from the stairs leading from the entryway to the bedroom. Cash in the amount of $600 was discovered in a gold Mercedes parked in the garage. No drugs were found on the premises. Nor did the officers observe any signs of forced entry into the residence.

Tom sustained "multiple traumatic" sharp force and blunt force injuries, most of them superficial or at least not immediately life-threatening, that were inflicted over "many minutes or hours." The primary and ultimately fatal slash wound was to the victim's neck, which severed his carotid artery and produced the "rapid exsanguination" of blood that caused his death. The presence of the ligature restraint and infliction of numerous wounds was "consistent with multiple individuals inflicting these injuries" on the victim, and indicated that he was struggling during the attack. The coroner estimated that Tom had been "dead for a few to several hours, but probably less than a day" before his body was discovered.

Toxicology reports revealed that not long before Tom's death he had ingested valium, methamphetamine, morphine, and cocaine, in amounts that did not cause his death. Tracks of needle marks on his arms and legs were evidence of "skin popping" that indicated habitual ingestion of drugs with the use of a needle. He also suffered from pulmonary emphysema and "poor circulation to the lower extremities" that caused him "difficulty moving around." He was "chronically ill" and in a "weakened state" that impaired his ability to resist an attack.

Fingernail clippings were taken from the victim. "[R]eddish material" discovered on the inside and outside of one of the fingernail clippings tested positive for blood. Expert testimony was received that the genetic material might have been deposited under Tom's fingernail if he scratched the killer with his hands while "resisting the assault." A DNA test of the blood and other "debris" taken from one of the fingernail samples identified defendant Ardoin "as a source of the minor profile."

The primary witness for the prosecution was Rebecca Burgos, who was the wife of defendant Jaquez when the murder was committed. Burgos admittedly has been a drug addict essentially all of her life, and continued to be a drug addict both when the murder occurred and when she testified at trial. She suffered prior convictions for robbery and assault with a deadly weapon in 1987, and possession of a controlled substance while in custody in 1993.

Burgos testified that she became acquainted with the victim in 2001, and thereafter regularly purchased heroin from him. Tom, in turn,

introduced Burgos to Jaquez in February of 2003, and they were married a month later. They began living in the downstairs "in-law apartment" of Tom's residence on Goettingen Street in late February of 2003. Burgos and Jaquez did not pay rent for the apartment. Rather, their agreement with Tom called for them to pay the utilities for the entire residence, "buy food," and do some cooking. Burgos described their ongoing relationship with Tom as "good." She testified that she viewed Tom "like a father" figure.

Tom was a drug dealer who often had "a whole lot of drugs" in his residence. He also kept a .22–caliber revolver inside a sock in his tackle box. Jaquez sold drugs "for himself" and for Tom. Burgos weighed, packaged and sometimes delivered cocaine and heroin. Tom obtained his drugs from a supplier, a Hispanic male, every week or every two weeks. When the supplier was scheduled to appear at Tom's residence, he directed Burgos and Jaquez to "stay downstairs." Tom would then knock on the floor to let them know when the supplier had left.

Burgos became acquainted with defendant Ardoin in 2003. By March of 2003 and thereafter, Burgos saw Ardoin quite frequently, when she and Jaquez visited his residence on Charter Oak Avenue to socialize or bring him drugs for his customers. Burgos testified that Ardoin would typically page Jaquez when he "had customers that wanted to purchase drugs." She and Jaquez would then take the drugs "to his house." They also often used heroin and crack cocaine with Ardoin and his girlfriend Michelle Reese.

By July of 2003, Burgos quit her job as an X-ray technician, and Jaquez worked only infrequently. They used "a lot of drugs" daily, and as a consequence were "broke." They failed to pay the bills for the residence, so in June of 2003 Tom told them to move out by August 1st. As a result, their relationship with Tom became strained and "edgy."

Burgos was aware that on July 9, 2003, Tom received a large delivery of drugs from his supplier. After the supplier left, Burgos observed the drugs in Tom's tackle box and on the kitchen table. That evening, Jaquez and Burgos visited the home of friends on Palou Avenue to get "high." After "a few more stops" they returned home to the "in-law" unit at Tom's residence. Two to four hours later Jaquez left without telling Burgos where he was going. Later still, Tom called Burgos on the intercom to tell her to "come upstairs" to his bedroom to receive a call from Jaquez. Around 2:00 a.m., Jaquez called and told Burgos that Tom "was going to give [her] something," meaning drugs, "to give to him." Jaquez also asked her to get Tom "something to eat."

Burgos agreed and left the house, only to return a few minutes later because she "forgot to get the drugs" from Tom. She parked her car in the driveway and walked through the open gate to the front door, which atypically was not locked. Burgos saw Ardoin standing in front of their in-law apartment, looking up the stairs toward Tom's residence. Suddenly, Burgos was grabbed from behind in the entryway, thrown to the ground on her stomach, and "hogtied" with her hands bound to her ankles with a rope. She did not see the

3

person who restrained her.  Burgos struggled, and heard a voice which she recognized as that of Jaquez tell her to "get down" and "just stay still."  After she was restrained, Burgos also saw Ardoin "go up the stairs" with a "Halloween Jason mask" on his face.

From upstairs Burgos heard pounding, banging, scuffling and odd "snapping" noises.  She also heard Tom repeatedly say, "I don't have anything."  Burgos yelled to Tom: "Rodney, if you have anything, please give it to him, please give it to him."  She continued to hear banging, and Tom stated, "There, now go."  After Tom yelled, "Here they come," and banged his foot, "it got quiet."  Ardoin then came down the stairs with Tom's "tackle box that he kept his drugs in."  He stepped over Burgos, walked out of the front door, and left.

Burgos struggled to release her arms from the rope and untie her ankles.  She went up the stairs to "check on" Tom in his bedroom.  Tom was lying on his stomach with a piece of carpet over his head.  Burgos approached Tom and noticed "a slash in his throat" and "a lot" of blood under his head.  She "panicked," grabbed Tom's cell phone and ran out of the room.  She called Ardoin's number, but his girlfriend Reese said Jaquez "wasn't there."

As Burgos sat on the floor of Tom's residence, Jaquez called.  When Burgos answered he asked, "What's up?"  Burgos, still in a panicked state, screamed that Tom was dead and Ardoin had killed him.  She asked Jaquez to get her out of there, and he agreed to do so.  When Jaquez arrived at the house he said, "Come on, let's go," and they proceeded to the in-law apartment.  Burgos was still "freaked out," crying, and continued to yell "Rodney is dead."  Jaquez implored Burgos to "calm down."  He told her, "I didn't know this was going to happen."

They drove to Ardoin's house, where Burgos noticed Tom's tackle box.  Ardoin was "separating the dope" stolen from Tom and dividing it among the three of them.  Burgos testified that Jaquez took her share of the drugs.  Ardoin suggested that Burgos call the police with a concocted story that she had been robbed.  Burgos "didn't know what to do."  She was "freaked out" that her friend Tom had been killed and "afraid of going to jail."

After an hour Burgos and Jaquez left Ardoin's house.  They decided that they "were going to go to Florida."  After a few "drug transactions" they went to a Howard Johnson's hotel early in the morning.  Jaquez left the hotel while Burgos slept until the afternoon.  She and Jaquez then left the hotel in an old brown car that belonged to a friend, Preston Ely.  They discussed a plan to "cover up Rodney's murder" whereby Burgos would be restrained and "thrown in McLaren Park."  She would then "get loose" and contact the police with a false report that she had been "robbed" and deposited in the park by the men who "killed Rodney."

Burgos and Jaquez proceeded to a drug store, where Jaquez purchased duct tape. From there, they drove to McLaren Park, where Burgos was placed on her stomach by Jaquez, with her wrists, feet and mouth taped.  Jaquez then hid the drugs elsewhere in the

4

park. Burgos fell asleep, and awoke near dark. She loosened the duct tape and hopped to the street. A woman picked her up, the tape was removed from her mouth, and she was taken to a pay phone to call the police.

The police arrived in response to her call and took Burgos to the Ingleside station. She was interviewed, and photographs were taken of her with tape on her wrists. Burgos fabricated a tale that two Black men and a woman had appeared at Tom's house, robbed and killed him "for his drugs," restrained and kidnapped her, then left her in the park. She added false descriptions of the suspects.

Ardoin was arrested for Tom's murder at his brother's residence on May 11, 2004, following the discovery of his DNA in a sample taken from one of the victim's fingernails. On July 11, 2004, both Jaquez and Burgos were arrested pursuant to a warrant served at a residence occupied by Rolley Hill and Christina Matthews at 1087 Palou Avenue in San Francisco. Various narcotics worth a "considerable amount" of money, including heroin, crack cocaine, methamphetamine, and prescription pill bottles that appeared to correspond to those found in Tom's house, along with crack pipes, a scale, plastic packaging material, and a "methadone card" with "Burgos photo and name on it" were seized from a bedroom in the house. Jaquez and Burgos were subsequently charged with possession of narcotics for sale.

Even after Burgos was arrested for Tom's murder and was confronted with considerable doubt cast upon her account of the crime—in the form of a receipt from the Howard Johnson's hotel when she was supposedly restrained in McLaren Park—she continued to give essentially the same fictitious story during subsequent interviews and in her testimony at a hearing in the present case. Burgos claimed that she repeatedly lied to protect her husband Jaquez and herself, and because she "didn't want to tell on anybody."

About six months before trial, Burgos decided to "tell the truth about what happened" after Jaquez repeatedly lied to her and refused to come forward and "say what they did" to protect her. She also received a threatening letter from Jaquez while she was incarcerated in county jail. Burgos denied that she assisted in any way with the killing of Tom by Ardoin and Jaquez. She acknowledged that her plea bargain, in which she agreed to plead guilty to being an accessory after the fact, was an appropriate disposition for her actions.

The prosecution presented additional evidence in an effort to indirectly corroborate Burgos's testimony. Jia Zhang, a Luxor taxicab driver testified that he picked up two Hispanic men in their "mid–40's" on Charter Oak Avenue, near the 101 Freeway, at 4:31 a.m. Three minutes later he dropped them off at the intersection of Dwight Street and Girard Street, two short blocks from Goettingen Street. In August of 2003, the police exhibited a photo lineup to Zhang. He made a "50/50" identification of Ardoin's photo as one of the men in his cab that morning. Zhang was not able to make an identification of Jaquez in another photo lineup.

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Maritza Santiago, the mother of Jaquez's two sons, testified that she was "romantically involved" with Jaquez in the early 1990's. In July of 2003, Jaquez continued to visit her house at 391 Bridgeview Drive in San Francisco regularly to "see his kids." Jaquez appeared at her house two or three days before Tom was killed. He was "broke," hungry, and appeared "stressed out." Jaquez told Santiago that "it was a big mistake" for him to be involved with Burgos.

Jaquez's son Eric testified that on July 9, 2003, Jaquez appeared at the house on Bridgeview Drive about 8:00 p.m. During the course of their conversation, Eric asked if Jaquez had "a couple of dollars," but Jaquez said "he didn't have it." In response to Jaquez's request Eric loaned him a cell phone.

Eric's cousin, Juan Henry Pena, also lived in Santiago's Bridgeview Drive residence in July of 2003. Pena testified that on the afternoon of July 9, 2003, Jaquez came by the house to borrow his cell phone. Pena met Jaquez in Silver Terrace Park the next afternoon; Jaquez seemed "nervous." He returned the cell phone to Pena, along with a pager. Jaquez told Pena that "he went home ... looking for his wife and that when he got there, the house was a mess." He saw Tom "on the floor with a bunch of blood around him," and he "didn't know what to do." Later the same afternoon, Pena gave Jaquez a ride. They drove past Tom's house at 674 Goettingen Street where Jaquez lived with Burgos. Police cars were parked outside the house. Pena drove Jaquez to the Franciscan Motel on Third Street.

Preston Ely, known to his friends as "Stevie," was acquainted with defendants and saw both of them frequently in July of 2003, usually about "drugs." Ely often lived in his half-ton van that he parked "off of Third Street," near Jamestown Avenue, in the Bayview District. Ely acknowledged that he used and sold drugs. Ely testified that between 10:00 and 11:00 on the morning of July 10, 2003, Jaquez, whom he knew as "Beto," arrived unexpectedly and asked to "trade cars." Ely agreed, and exchanged his brown Ford Granada for Jaquez's Mitsubishi van. Ely also agreed to loan Jaquez his cell phone in exchange for speed and crack cocaine.

Later that evening Jaquez visited Ely in his room at the Franciscan Motel on Third Street. Jaquez complained that Ely's Ford Granada "ran out of gas" in McLaren Park, and Jaquez left it there. Jaquez told Ely that he had seen his landlord, a "Chinese dude" who lived upstairs from him, "lying there with his throat cut." Jaquez stated that he was "having problems getting drugs" from Tom, and was "being put out" of his residence for failing to pay rent. Jaquez received phone calls while he was at Ely's motel room. He became "very upset," and "started crying." In reference to the "Chinese dude getting killed," Jaquez told Ely, "I didn't do it, it wasn't me. It wasn't supposed to happen." Jaquez also mentioned that he had placed duct tape on a woman in McLaren Park and "that he was going to call the police" to "come get her and use that as an alibi."

After their conversation in the motel room, Jaquez and Ely drove to

McLaren Park in the Mitsubishi to "find the drugs" Jaquez and Burgos had previously concealed there. Jaquez left the car to search in the park, but did not return with anything. They drove back to the Franciscan Motel. On the way they fortuitously encountered Burgos on the street, and she joined them. Later still, the three of them returned to the same place in the park, where Burgos promptly found the hidden drugs. They went back to the motel room and ingested drugs before Jaquez and Burgos left. Ely testified that in the motel room Burgos was "hollering" and "bossing around" people, particularly Jaquez.

Ely further testified that about eight months before trial he received a call from Jaquez, who told him to "stay out of it, he got the case beat, to stay out of it." Jaquez sounded "serious," and Ely felt "threatened." Ely entered the witness protection program in December of 2006. He was relocated by the prosecution, and received both a "living place" and expenses from the State of California.

The prosecution also presented evidence of records of calls made with the telephones owned, borrowed, or used by defendants on or near the date of the murder. The records revealed numerous calls between them on July 10, 2003. Ardoin testified in his defense at trial that he and Jaquez were "very close" friends for many years. He met Burgos just after she married Jaquez in 2003. Ardoin considered Burgos to be aggressive, pushy, manipulative, and not entirely honest.

Ardoin acknowledged that he was a drug addict, who not only used cocaine, crack, heroin and methamphetamine regularly, but also sold drugs "every day." He and Jaquez often used drugs together. Ardoin was also acquainted with Tom as a supplier of heroin, who dealt larger amounts of drugs than he did. Ardoin bought drugs from Tom occasionally.

According to Ardoin, Tom visited Ardoin's residence on Charter Oak Avenue the afternoon before Tom was killed. Tom brought with him a half ounce of "new heroin." Ardoin sought to explain the DNA evidence by testifying that Tom injected him with heroin, and in the process drops of blood ran down his arm. After testing the heroin and determining that it "was good," Ardoin bought a quarter ounce from Tom.

About 4:00 a.m. on July 10, 2003, Jaquez called to tell Ardoin that "he was coming over" to his house. They intended to "buy some coke together." While Ardoin and Tom were in the shed, Burgos called, "hollering and screaming" that she "needed to talk to her husband." After a brief telephone conversation with Burgos, Jaquez's expression changed "in a bad way." He was anxious and angry. Jaquez asked Ardoin to accompany him to his house. Ardoin agreed, although he expressed that he was "walking with a cane" at the time and could not offer much assistance.

Jaquez and Ardoin took a cab to a residence near Brussels Street and Dwight Street. Jaquez "went up the stairs to the house" while Ardoin waited on the street. Within 30 seconds Jaquez returned and

told Ardoin to "hurry up" and follow him up the hill to the Tom's house on Goettingen Street.   As Ardoin reached Jaquez's green Mitsubishi, he noticed Jaquez coming out of a gate into the house, followed by Burgos.  Burgos was disheveled, with her hair "messed up," and was carrying a tackle box by the handle.   She was "hollering and screaming" at Jaquez, who was carrying a plastic garbage bag with something inside it.

They all got in the Mitsubishi to drive to Ardoin's house. Ardoin asked, "What's happening?"  Burgos yelled at him, "Rodney's dead." Jaquez then "slammed on the brake" and looked at Burgos in "shock."    When they reached Ardoin's house, Burgos said "something" to Ardoin with an "angry and wild" look which he took as a threat.   Ardoin testified that he did not see Jaquez again until "2004 in court," although he spoke to him on the telephone a week or so after the murder.   They did not "talk about what happened."   Ardoin helped Burgos move her belongings out of the Goettingen Street residence "a couple of days later," and continued to take drugs and socialize with her.

Ardoin denied that he went into Tom's house the day of the murder or assisted anyone with the robbery and murder of Tom.   He conceded that he lied in interviews with the police, to protect Jaquez and Burgos.   Ardoin also agreed that the presence of his DNA under the victim's fingernails was "important in this case," and he had "no idea how that happened."   Ardoin speculated that blood reached the victim's fingernails during the intravenous injection of heroin the day before the murder.

*People v. Ardoin*, 196 Cal. App. 4th 102, 108-16 (2011) (footnotes omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by

1   [the Supreme] Court on a question of law or if the state court decides a case differently than [the

2   Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

3   A state court decision is an "unreasonable application of" Supreme Court authority, falling under

4   the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the

5   Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

6   case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that

7   court concludes in its independent judgment that the relevant state-court decision applied clearly

8   established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be

9   "objectively unreasonable" to support granting the writ. *Id.* at 409.

10       Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will

11   not be overturned on factual grounds unless objectively unreasonable in light of the evidence

12   presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v.*

13   *Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, in conducting its analysis, the federal

14   court must presume the correctness of the state court's factual findings, and the petitioner bears the

15   burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

16       The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

17   state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d

18   1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to

19   consider the petitioner's claims, the court looks to the last reasoned opinion. *See Nunnemaker* at

20   801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

### DISCUSSION

22       As grounds for federal habeas relief, petitioner asserts that: (1) the trial court erred in

23   excluding impeachment evidence against a witness; (2) the prosecutor committed misconduct

24   when he commented on petitioner's failure to testify; and (3) cumulative error.

### I.   EXCLUSION OF EVIDENCE

26       Petitioner argues that the trial court's decision to exclude evidence of the facts and

27   circumstances underlying Burgos's past convictions violated his right to confrontation, and his due

28   process rights to present a defense and to a fair trial under the Sixth and Fourteenth Amendments.

United States District Court
Northern District of California

1  Pet. at A-5, A-6.

2      **Background of Claim**

3      The California Court of Appeal summarized the factual background of this claim as follows:

4          Prior to trial Jaquez moved to present as impeachment evidence of
           prior acts by Burgos that reflected on her "dishonesty and tendencies
5          towards acts of violence and moral turpitude," which included the
           circumstances of her 1988 convictions for robbery and assault with a
6          deadly weapon: That Burgos approached the victim, solicited for an
           act of prostitution, and directed him to drive his vehicle to a "dead
7          end," where she produced a handgun and ordered him to give her his
           wallet, money, and keys; as Burgos's codefendant, Payne,
8          approached the rear of the vehicle, her attention was diverted
           momentarily, whereupon the victim grabbed the gun, which fired a
9          shot through the driver's side window; after Payne then stabbed the
           victim several times in the neck and chest, he and Burgos both "fled
10         the scene." Burgos entered a guilty plea to charges of robbery and
           assault with a deadly weapon after a charge of attempted murder
11         was dismissed. She offered a different version of the incident in her
           statement to the police, in which she denied that Payne had any
12         "involvement" in the crimes, although she did not testify on behalf
           of Payne at his trial, and made "statements to the judge inculpating"
13         Payne during an in-chambers hearing on a motion for acquittal of
           the attempted murder charge under section 1118.1.

14         At a hearing on the motion the defense also asked to offer evidence
           that while Burgos was incarcerated awaiting trial in the present case
15         she attempted through her boyfriend Dennis Torres and her attorney
           to have drugs delivered to her in county jail.   The effort was
16         unsuccessful and did not result in charges, but Burgos was
           subsequently convicted for possession of heroin in jail based on a
17         separate incident.   Jaquez argued that the evidence was admissible
           under Evidence Code section 788 to demonstrate Burgos's "moral
18         depravity," dishonesty, manipulation of others, and propensity to
           acts of violence.

19
           The trial court granted the motion to impeach Burgos with evidence
20         of the fact of her 1988 robbery and assault with a deadly weapon
           conviction, and with the 2006 conviction for possession of drugs in
21         San Francisco County Jail, but excluded evidence of the particular
           circumstances of the offenses and her statements related to the
22         offenses.  The "conduct concerning conspiracy to smuggle drugs in
           San Francisco County Jail" through Burgos's boyfriend and attorney
23         was also excluded.

24  *Adroin*, 196 Cal. App. 4th at 117-18.

25      **A.    Legal Standard**

26          **i.    Confrontation Clause**

27      The Confrontation Clause of the Sixth Amendment provides the accused in criminal cases

28  the right to "be confronted with witnesses against him." U.S. Const. Amend. VI.  The federal

confrontation right applies to the states through the Fourteenth Amendment.  *See Pointer v. Texas*, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004). It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination).  Nevertheless, the Confrontation Clause does not prevent a trial judge from imposing reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam); *see, e.g.*, *Coleman v. Calderon*, 150 F.3d 1105, 1112 (9th Cir. 1998) (Confrontation Clause does not require that prosecutor disclose evidence that will help defense effectively cross-examine a prosecution witness), *rev'd and remanded on other grounds by*, 525 U.S. 141, 147 (1998).

Confrontation Clause claims are subject to harmless error analysis.  *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004); *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the standard applicable to Confrontation Clause violations is whether the inadmissible evidence had an actual and prejudicial effect upon the jury.  *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

### ii.    Right to Present a Defense

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth or Fourteenth Amendment guarantee of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)); *see California v. Trombetta*, 467 U.S. 479, 485 (1984) (due process); *Chambers v.*

*Mississippi*, 410 U.S. 284, 294 (1973) (compulsory process).

The admission of extrinsic evidence of specific instances of a witness' conduct to impeach the witness' credibility may, however, confuse the jury, unfairly embarrass the victim, surprise the prosecution and/or unduly prolong the trial.  No Supreme Court decision "clearly establishes that the exclusion of such evidence for such reasons in a particular case violates the Constitution." *Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013) (also rejecting Ninth Circuit's reasoning that Supreme Court cases clearly establish that the Constitution requires a case-by-case balancing of interests before state evidentiary rule can be enforced).  A violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict.  See *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (citing *Brecht*, 507 U.S. at 637-38).

**B.    Analysis**

The California Court of Appeal set forth the relevant state law on the admission of evidence and denied this claim:

> While we do not discount the probative value of evidence that Burgos engaged in violent acts, manipulation, and deceit, we conclude that under the circumstances presented here the trial court at least acted within its discretion in precluding further defense cross-examination.  First and foremost, the defense had both the opportunity and the evidentiary substance to thoroughly challenge Burgos's credibility without the excluded evidence.  Not only did the fact of the prior convictions and her admitted use of a firearm during the robbery and assault offenses adequately indicate her violent nature and moral indigence, but her character and testimony were thoroughly challenged with withering and successful attacks on many other levels.  She was effectively portrayed as an inveterate drug addict who admittedly sold drugs and "went to great lengths" to have others bring drugs to her in jail.  She admitted and the prosecutor conceded that she lied incessantly to the police and to others to further her perceived interests.  Testimony was received from others that Burgos was manipulative, controlling, and subject to unruly outbursts.  Burgos admitted as much.  During closing argument defense counsel stressed her dishonesty, repeated and elaborate fabrications, and palpable moral deficiencies.  Further, the extent to which the jury accepted Burgos's testimony was clearly not attributable to the inability of the defense to attack her character or inherent lack of credibility—which effectively occurred—but rather to the corroboration of her version of the murder, particularly by the DNA evidence and Ely's consistent testimony.  Thus, while the excluded impeachment evidence may have augmented the showing that Burgos lacked credibility it was cumulative, and, in our view, would not have produced a perceptibly different impression of her

1      credibility.

2            . . .

3      We do not suggest that the probative value of the excluded collateral
       acts evidence was inconsequential, but we agree with the trial court

4      that it was outweighed by the confusion of issues and considerable
       amount of time required to present it.  Candidly, the defense had

5      already spent itself on what can be characterized as an assaultive
       cross-examination of Burgos.  Had the evidence been admitted, the

6      trial would have digressed into a lengthy dispute over the collateral
       matters related to the facts of Burgos's 1988 convictions, the

7      truthfulness of her statements in that criminal proceeding, and her
       attempt to use her boyfriend and unwitting attorney to obtain drugs

8      in jail.  "'[T]he latitude [Evidence Code] section 352 allows for
       exclusion of impeachment evidence in individual cases is broad.

9      The statute empowers courts to prevent criminal trials from
       degenerating into nitpicking wars of attrition over collateral

10     credibility issues.' [Citation.]"  "'[T]he discretion to be exercised is
       that of the trial court, not that of the reviewing court,'" and even if

11     we may have ruled otherwise in the first instance we cannot reverse
       a decision that is supported by the record.  We discern no abuse of

12     the trial court's discretion in the evidentiary ruling and no violation
       of defendants' rights to confront and cross-examine Burgos at trial.

13     *Adroin*, 196 Cal. App. 4th at 121-23 (citations omitted).

14       Petitioner has failed to demonstrate that the state court opinion was an unreasonable

15     application of Supreme Court authority with respect to either the Confrontation Clause or the right

16     to present a defense.  For the same reasons given by the California Court of Appeal, the Court

17     agrees that the impeachment evidence petitioner sought to elicit from Burgos on cross-

18     examination was cumulative and thus would not have produced a perceptibly or significantly

19     different impression of her credibility.  Moreover, the exclusion of extrinsic impeachment

20     evidence for the reasons provided by the state court is not contrary to clearly established Supreme

21     Court precedent.  *See Jackson*, 133 S. Ct. at 1994.

22       Even assuming the trial court erred by not allowing in all of the impeachment evidence, the

23     error did not have a substantial and injurious effect on petitioner's verdict to warrant habeas relief.

24     Burgos's credibility was thoroughly impeached at trial.  Specifically, evidence was introduced that

25     she had been a drug addict her "entire life," including the day of her trial testimony, RT at 1418;

26     that she had prior convictions for robbery and assault with a deadly weapon, and two prior

27     convictions for possession of a controlled substance in a jail or prison, RT at 1419-20; that she had

28     originally been facing a sentence of seventy-five years to life for murder in connection with Tom's

United States District Court
Northern District of California

13

death but had received a sentence of six years as an accessory after the fact in exchange for her testimony against petitioner, RT at 1479-86; that she had told a phony story about Tom's death to the police in order to cover up the identity of Tom's assailants, RT at 1584-89; and that she was controlling, manipulative, and dishonest, RT at 2541-45.  The additional evidence that petitioner argues should have been allowed would have been cumulative of the evidence already admitted. Accordingly, the state court's decision to exclude evidence of the facts and circumstances underlying Burgos's past convictions did not have a substantial and injurious effect on petitioner's verdict, and petitioner is not entitled to habeas relief on this claim.

## II.     PROSECUTORIAL MISCONDUCT

Petitioner next argues that the prosecutor violated his Fifth Amendment right not to testify by impermissibly commenting three separate times on his failure to testify during closing argument.

### Background of Claim

During closing argument, the prosecutor summarized the evidence that had been presented at trial and stated that he had the burden of proof.  RT at 2707-12.  After discussing the prosecution evidence, the prosecutor listed the defense evidence:

> From the defense side, from the defense side, we had two days of testimony.  Mr. Wise [codefendant Ardoin's attorney] produced some doctors.  A methadone drug counselor, a DNA witness, Mr. Taylor, and of course, Mr. Ardoin himself.

> As to the defense side on [petitioner] -- as to [petitioner], there was no defense evidence.

RT 2711-12.[2]

During closing argument, petitioner's trial counsel noted that the codefendant testified in his own defense to explain why there was evidence of his DNA under the fingernail of the victim. RT at 2797.  Petitioner's trial counsel then stated with respect to the codefendant's testimony:

> That is his testimony, his statement, delivered here in court on his own behalf, not on behalf of [petitioner].

> [Petitioner's]  defense,  I  respectfully  say  to  [codefendant]  Mr.

---

[2] Petitioner's trial counsel interrupted and asked to approach the bench.  RT at 2712.  There was an unreported bench discussion, and the prosecutor continued with his argument.  *Id.*

> Ardoin and his counsel and to you, neither adopts it or approves.
>
> It did not merit my cross-examination of it.
>
> It adds nothing of value to the government's case against my client, [petitioner].
>
> Whether it is credible or not is up to you.
> The testimony of [codefendant] Mr. Ardoin.

RT at 2797.

Later, petitioner's trial counsel conceded that petitioner had possession of the victim's stolen drugs after the murder.  RT at 2834, 2838.  Petitioner's trial counsel also argued that based on Burgos's testimony, the jury could conclude that a reasonable interpretation of this evidence was that petitioner was covering up for Burgos's involvement.  RT at 2840.

In the prosecutor's rebuttal argument, he showed the jury a chart entitled "Circumstantial Evidence Rule."  RT 2967.  Summarizing the rule, the prosecutor said, "If there are two possible interpretations of circumstantial evidence, one is reasonable, the other is not reasonable, you must accept the reasonable, reject the unreasonable."  RT at 2967.  The prosecutor then proceeded to apply the rule to the facts of the case, asking the jury, "If all of the following things I say to you, members of the jury, are substantially true in this case, is it reasonable, is it reasonable to conclude that these defendants are not guilty?"  RT at 2967.  In applying the rule, the prosecutor raised the following points:

> Number four, [petitioner] has no innocent explanation about being with, as Mr. Gaines [petitioner's attorney] is not stupid, had to concede, being with, in the possession of Rodney's drugs on Palou Street the next day.  No innocent explanation.

RT at 2968.

The prosecutor continued his discussion of the "Circumstantial Evidence Rule" and stated, "Number six, there is no innocent explanation regarding the taping up and in the park; haven't heard anything about that."  RT at 2969.

Petitioner's trial counsel objected to the two comments made during the prosecution's rebuttal.  RT at 3010-14.  The prosecutor responded that he was not commenting on petitioner's silence, rather he was referring to trial counsel's failure to provide a reasonable interpretation of the evidence.  RT at 3014-16.  The trial court did not declare a mistrial, finding that it was a fair

1    interpretation that the prosecutor's comments were attributed to the evidence presented and not to
2    petitioner's failure to testify.  RT at 3017.

3    **A.    Legal Standard**

4         Where a prosecutor on his own initiative asks the jury to draw an adverse inference from a
5    defendant's silence, or to treat the defendant's silence as substantive evidence of guilt, the
6    defendant's privilege against compulsory self-incrimination is violated.  *See Griffin v. California*,
7    380 U.S. 609, 615 (1965).  While it is proper for the prosecution to address the defense arguments,
8    a comment is impermissible if it is manifestly intended to call attention to the defendant's failure
9    to testify, or is of such a character that the jury would naturally and necessarily take it to be a
10   comment on the failure to testify.  *See Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) (citation
11   omitted).

12        However, such commentary by the prosecutor requires reversal only if "(1) the
13   commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for
14   the conviction; and (3) where there is evidence that could have supported acquittal."  *Jeffries v.*
15   *Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993) (citation omitted); *see also United States v.*
16   *Rodriguez-Preciado*, 399 F.3d 1118, 1132 (9th Cir.), *amended*, 416 F.3d 939 (9th Cir. 2005)
17   (holding that comment on the defense's failure to explain introduced testimony or evidence does
18   not infringe on defendant's Fifth Amendment rights).  "A prosecutor may, consistent with due
19   process, ask a jury to convict based on the defendant's failure to present evidence supporting the
20   defense theory."  *Menendez v. Terhune*, 422 F.3d 1012, 1034 (9th Cir. 2005*); see also United*
21   *States v. Garcia-Guizar*, 160 F.3d 511, 521-22 (9th Cir. 1998) (prosecutor did not shift the burden
22   of proof in commenting on defendant's failure to produce evidence).  Indeed, as the Ninth Circuit
23   has recognized, "a prosecutor may comment on the absence of evidence even when such evidence
24   was available, but inadmissible, so long as there is sufficient evidence to support the prosecutor's
25   version of events."  *Menendez*, 422 F.3d at 1034.

26        Even when a prosecutor's comments violate *Griffin*, harmless error analysis applies.
27   *Chapman v. California*, 386 U.S. 18, 21-22 (1967).  Thus, habeas relief is unavailable unless the
28   error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*

United States District Court
Northern District of California

16

1    *v. Abrahamson*, 507 U.S. 619, 637-38 (1993).  "[C]ourts will not reverse when the prosecutorial

2    comment is a single, isolated incident, does not stress an inference of guilt from silence as a basis

3    of conviction, and is followed by curative instructions."  *Lincoln*, 807 F.2d at 809.  When the

4    comment is limited and could not have affected the verdict, *Griffin* error is harmless even where

5    there was no curative instruction.  *Hovey v. Ayers*, 458 F.3d 892, 913 (9th Cir. 2006).

6    **B.    Analysis**

7         The California Court of Appeal discussed *Griffin* and related state law, and then rejected

8    petitioner's claim:

> We conclude that the prosecutor's argument falls into the category
> of fair commentary on the evidence, not impermissible references to
> Jaquez's assertion of his privilege against self-incrimination.  The
> first comment was merely a summation of the state of the evidence
> presented by the parties, and accurately pointed out that Jaquez did
> not present any evidence in his defense.  The remaining two
> comments during *rebuttal* argument were made in *response* to
> defense counsel's closing argument.  The allusion to Jaquez's
> unexplained possession of Tom's drugs after the murder was in
> reference to defense counsel's argument that the "after the fact" joint
> possession of narcotics with Burgos "does not prove that he is liable
> for the murder of Rodney Tom beyond a reasonable doubt." Rather
> than contest Burgos's testimony that they shared Tom's drugs, the
> defense acknowledged the drug possession but discounted its value
> in proving that Jaquez participated in the murder.  The prosecutor
> then merely commented on the failure of the defense to explain the
> drug possession; he did not intimate that Jaquez's failure to testify
> indicated his guilt.  (*People v. Hughes*, *supra*, 27 Cal.4th 287, 373.)
> As for the prosecutor's statement that the evidence did not include
> any "innocent explanation regarding the taping up and in the park,"
> taken in context the focus again was upon the failure of the defense
> to present argument on the matter, not the lack of testimony from
> Jaquez.  In contrast to *Griffin* and *People v. Medina* (1995) 11
> Cal.4th 694, 755–756 [47 Cal.Rptr.2d 165, 906 P.2d 2], the
> defense could have offered an explanation, without testimony from Jaquez,
> for the evidence that Burgos was duct-taped in McLaren Park in a
> conspiratorial effort to cast suspicion away from defendants.  We are
> not persuaded that the jury was reasonably likely to view "the
> prosecutor's statement as an invitation to draw an impermissible
> inference of guilt from defendant's failure to testify."  (*People v.
> Frye*, *supra*, 18 Cal.4th 894, 977.)   The prosecutor's comments
> merely reflected the existing state of the evidence and argument.
> (*People v. Johnson* (1992) 3 Cal.4th 1183, 1229 [14 Cal.Rptr.2d
> 702, 842 P.2d 1].)  No *Griffin* error occurred.

26   Resp. Ex. 8 at 21-22 (emphases in original).

27        The state court's determination that the prosecutor's comments did not constitute *Griffin*

28   error was not contrary to, or an unreasonable application of, clearly established Supreme Court

United States District Court
Northern District of California

precedent.[3]  The prosecutor's comments were not "manifestly intended to call attention to the defendant's failure to testify," nor were they "of such a character that the jury would naturally and necessarily take [them] to be a comment on the failure to testify."  *See Lincoln*, 807 F.2d at 809; *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.")  The present case is thus unlike *Griffin*, where the prosecutor repeatedly stressed that the petitioner would have known what had happened to the victim and explicitly mentioned the petitioner's failure to take the stand.  380 U.S. at 610-11.

In this case, the comments were from a few isolated incidents of the closing argument and did not stress an inference of guilt based on petitioner's silence.  *See Lincoln* at 809.  Petitioner conceded the first statement was not an error, and the second and third comments were in rebuttal to specific points of evidence raised by petitioner's trial counsel in his closing argument. Petitioner's trial counsel attempted to explain why petitioner was in possession of the victim's drugs and why Burgos faked her own kidnapping.  It was reasonable for the California Court of Appeal to conclude that the prosecutor was not commenting on petitioner's silence, but rather on trial counsel's attempts to explain away the incriminating evidence.  *See, e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 179 (1986) (a prosecutor's remarks on rebuttal "must be evaluated in light of the defense argument that preceded it . . . .").  The state court's denial of this claim was not objectively unreasonable, and, even assuming there was an error, petitioner has failed to show that it had a substantial and injurious effect on the verdict.  This claim is denied.

## III.   CUMULATIVE ERROR

Petitioner contends that the cumulative errors from the claims above rendered the trial fundamentally unfair.

### A.   Legal Standard

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

---

[3] Petitioner himself concedes, as did appellate counsel on direct review, that the prosecutor's first comment "passes muster under the rule that a prosecutor may comment on a total lack of evidence."  Pet. at B-2.

the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Cumulative error is more likely to be found prejudicial when the government's case is weak. *See id.*; *see, e.g., Thomas v Hubbard*, 273 F.3d. 1164, 1180 (9th Cir. 2002) (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002). However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Similarly, there can be no cumulative error when there has not been more than one error. *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

### B.    Analysis

This claim was not addressed by the California Court of Appeal, and the California Supreme court denied it without a reasoned opinion. When presented with a state-court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state-court decision is objectively unreasonable. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

The California Supreme Court's denial of this claim was not unreasonable. This Court has not found any constitutional errors, let alone multiple errors that cumulatively could allow for reversal. Even assuming it was an error to deny certain impeachment evidence or that the prosecutor erred in his closing arguments, these errors were not so prejudicial as to warrant habeas relief. This claim is denied.

## IV.    CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a

substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id*. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made such a showing for any of the claims.  A certificate of appealability is denied.

**CONCLUSION**

1.      For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate of Appealability is **DENIED**.

2.      Petitioner's motion for confirmation (Docket No. 28) is **DENIED**.

3.      The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: March 26, 2015

_____
JAMES DONATO
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALBERT P. JAQUEZ,

        Plaintiff,

    v.

P.D. BRAZELTON,

        Defendant.

Case No.  12-cv-03359-JD

**CERTIFICATE OF SERVICE**

    I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

    That on 3/26/2015, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Albert P. Jaquez ID: G-26111
Pleasant Valley State Prison
P.O. Box 8500
Coalinga, CA 93210-8500

Dated: 3/26/2015

Richard W. Wieking
Clerk, United States District Court

By:_____
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO

United States District Court
Northern District of California